IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CARLOS A. CARRERO,

**Plaintiff**

v.

MOLINA HEALTHCARE OF PUERTO
RICO, INC.,

**Defendant**

CIVIL NO. 21-1605 (RAM)

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendant Molina Healthcare of Puerto Rico, Inc.'s ("Molina PR" or "Defendant") motion for summary judgment (the "Motion"). (Docket No. 44). For the reasons set forth below, the Motion is **GRANTED**.

### I.   PROCEDURAL BACKGROUND

On December 14, 2021, former Chief Executive Officer ("CEO") for Molina PR Carlos Carrero sued his former employer under Puerto Rico contract law for *dolo*, or deceit. (Docket No. 1). Mr. Carrero had negotiated and signed a severance agreement after Molina PR announced that it would be exiting the Puerto Rico healthcare market by August 2021. Id. ¶¶ 3.9–3.10, 3.16. As part of that agreement, Mr. Carrero left the company by March 2021. Id. ¶ 3.19. Plaintiff Carrero alleges that had he not been led to believe that

his position would be eliminated as of March 2021, he would not have taken the severance package. Id. ¶¶ 3.21-3.22.

Following the close of discovery, Molina PR filed the present motion for summary judgment on March 30, 2023. (Docket No. 44). On May 26, 2023, Plaintiff filed his opposition. (Docket No. 53). The parties filed a reply and sur-reply on June 9, 2023 and July 3, 2023, respectively. (Docket Nos. 56 and 59).

## II.   APPLICABLE LAW

### A. Summary Judgment

A motion for summary judgment is governed by Fed. R. Civ. P. 56(a). Summary judgment is proper if the movant shows that (1) there is no genuine dispute as to any material fact and (2) he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (citation and internal quotation marks omitted). A fact is considered material if it "has the potential of affecting the outcome of the case." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (citations and internal quotation marks omitted).

The moving party has "the initial burden of showing that no genuine issue of material fact exists." Id. The burden then shifts to the nonmovant to "respond to a properly supported motion with

sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which [it] has the burden of proof." Id. (citations and internal quotation marks omitted).

While a court will draw all reasonable inferences in favor of the non-movant, it will disregard conclusory allegations, unsupported speculation, and improbable inferences. *See* Johnson v. Duxbury, Mass., 931 F.3d 102, 105 (1st Cir. 2019) (citation omitted). Moreover, the existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" the fact must be material. Scott v. Harris, 550 U.S. 372, 380 (2007) (emphasis in original) (quotation omitted).

A court should review the record in its entirety and refrain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 135 (2000) (citations omitted). If adjudicating the matter would require "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts[,]" then summary judgment is not appropriate, as these "are jury functions, not those of a judge[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

In this District, summary judgment is also governed by Local Rule 56. *See* L. CV. R. 56(c). Per this Rule, an opposing party must "admit, deny or qualify the facts supporting the motion for

summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. Furthermore, unless the fact is admitted, the opposing party must support each denial or qualification with a record citation. Id.

Additionally, Local Rule 56(c) allows an opposing party to submit additional facts "in a separate section[.]" Id. Given that the plain language of Local Rule 56(c) specifically requires that any additional facts be stated in a separate section, parties are prohibited from incorporating numerous additional facts within their opposition. See Natal Pérez v. Oriental Bank & Trust, 291 F. Supp. 3d 215, 218-19 (D.P.R. 2018) (quoting Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) and Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 207 (D.P.R. 2013)).

If a party opposing summary judgment fails to comply with the rigors that Local Rule 56(c) imposes, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (citations omitted). Thus, litigants ignore this rule at their peril. Id.

**B. _Dolo_**

As this case involves diversity jurisdiction, Puerto Rican contract law controls. Under Puerto Rico contract law, _dolo_ (_i.e._, deceit) may exist "either in the formation of a contract where a party obtains the consent of another through deceptive means, or

in the performance of a contractual obligation where a party knowingly and intentionally, through deceitful means, avoids complying with its contractual obligations." Feliciano-Muñoz, 970 F.3d at 62 (citations and internal quotation marks omitted).

*Dolo* may not be presumed, and the party alleging *dolo* bears the burden of proof. Id. at 63 (citations omitted). To prove *dolo*, a plaintiff must show: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud." Id. at 64 (citations omitted).

Furthermore, "the Puerto Rico Supreme Court has noted the important social interest in holding parties to their contracts, and therefore the validity of [a] contract and of the consent is presumed[.]" Citibank Glob. Mkts. Inc. v. Rodriguez Santana, 573 F.3d 17, 24 (2009) (citation and internal quotation marks omitted).

### III.   FINDINGS OF FACT

To make findings of fact, the Court reviewed the *Statement of Undisputed Material Facts in Support of Defendant Molina Healthcare of Puerto Rico, Inc.'s Motion for Summary Judgment* and its exhibits (Docket No. 44); Plaintiff's *Statement of Additional Uncontested Material Facts* and its exhibits (Docket No. 53); as well as each party's responses thereto (Docket Nos. 53 and 56). After **only crediting material facts that are properly supported by**

**a record citation and uncontroverted,** the Court makes the following findings of fact:[1]

1. Molina Healthcare Inc. ("Molina") is a national healthcare company that operates various state and regional health plan subsidiaries, including Molina PR. (Docket No. 44-2 ¶ 1).

2. Each health plan operated by Molina is managed by a Health Plan President ("Plan President") who reports to the leadership at Molina and serves as chief executive of their health plan subsidiary. Id. ¶ 2.

3. In April 2017, Mr. Carrero was hired to serve as Plan President for Molina PR. Id. ¶ 4.

4. When hired by Molina PR in 2017, Mr. Carrero was an experienced healthcare executive with over 20 years of experience in the industry, including service in senior positions such as Executive Director, Chief Operating Officer, and Chief Executive Officer, at five different companies in the healthcare industry. Id. ¶ 5.

5. As Plan President of Molina PR, Mr. Carrero received various forms of compensation, including a base salary, which was $270,000 in 2021, Short Term Incentives based on personal and companywide performance, and Long-Term Incentives in the form

---

[1] References to a specific finding of fact shall be cited in the following manner: (Fact ¶ _).

of stock awards which were governed by Restricted Stock Award Agreements. Id. ¶ 6.

6. Starting in 2019, discussions occurred within Molina concerning a possible sale of the assets of Molina PR or some other form of exit from the Puerto Rico healthcare market. Id. ¶ 12.

7. Sometime during summer 2020, Molina notified the Puerto Rico Administration of Health Insurance Services that it would cease providing services for the Vital program, Puerto Rico's publicly funded health insurance plan. This was Molina's only business venture in Puerto Rico. (Docket Nos. 53-2 ¶ 2; 1 ¶ 3.3; 17 ¶ 3.3).

8. Mr. Carrero understood that a sale or other exit from Puerto Rico by Molina meant that, as its Plan President, "sooner or later" he would be "out." (Docket No. 44-2 ¶ 17).

9. On May 5, 2020, Mr. Carrero emailed Molina Executive Vice President Marc Russo to ask if anyone would be retained, to which Mr. Russo responded: "Carlos, my priority was to get the process going for you" and told him that Larry Anderson, the Global Head of Human Resources for Molina, would get in touch with him. Id. ¶ 19.

10.    Prior to this email, Mr. Carrero had discussions with Mr. Russo about obtaining financial security for himself and

understood the email to mean that he would be taken care of.
<u>Id.</u> ¶ 20.

11. On May 13, 2020, Mr. Carrero emailed Mr. Russo, Molina CEO
Joseph Zubretsky, and Larry Anderson. (Docket Nos. 44-2 ¶ 21;
44-13 ¶ 12; 44-19 at 2-4).

12. In that email, Mr. Carrero "pleaded [his] case" to get cash
value for a "higher percentage of [his] stocks" that would be
forfeited as a result of his departure. (Docket Nos. 44-2 ¶
21; 44-4 at 36-37; 44-13 ¶ 12; 44-19 at 2-4).

13. Mr. Carrero's email stated:

> I currently hold 4,095 shares. I have 623
> vesting on July 1, 2020. For the remaining
> 3,472 shares the, [sic] offer provided by
> Molina is a cash value payment ($195,000) 32%
> (pricing performance shares at 100%) of
> today's closing price. I would greatly
> appreciate if a reconsideration of anything
> above 50% of today's closing price is
> possible. That would be the Cash Value.

(Docket Nos. 44-2 ¶ 21; 44-13 ¶ 12; 44-19 at 4).

14. Mr. Carrero's email also stated: "I commit that your response
will be the end of the conversation. I have great, positive
memories in Molina and those are the ones I will leave with."
(Docket Nos. 44-2 ¶ 21; 44-13 ¶ 12; 44-19 at 4).

15. In response to this email, Mr. Zubretsky emailed Mr. Anderson
that he would "stay out of it" but to "take care of" Mr.
Carrero, who he believed was a "good guy[.]" (Docket No. 44-
2 ¶ 22).

16. Following this exchange, Mr. Anderson increased Molina's offer to Mr. Carrero to $275,000. This amount was included in the severance agreement as a "performance bonus." (Docket Nos. 44-2 ¶ 23; 44-13 ¶ 14; 44-21 at 3; 44-29 at 3).

17. On May 26, 2020, Mr. Anderson emailed Mr. Carrero the severance agreement (henceforth, the "Original Waiver and Release Agreement"). Mr. Anderson's email also stated: "Please note, the only item missing at this point is to determine your last day. As things progress, you and Marc [Russo] will determine what makes sense." (Docket Nos. 44-2 ¶ 24; 44-13 ¶ 16; 44-20 at 3).

18. The same day, Mr. Carrero responded to Mr. Anderson to confirm that his termination date would be after July 1, 2020. Mr. Anderson confirmed that would be the case. (Docket No. 44-2 ¶ 25).

19. Mr. Carrero signed the Original Waiver and Release Agreement on June 2, 2020 and returned it to Mr. Anderson on June 10, 2020. (Docket Nos. 44-2 ¶ 25; 44-13 ¶ 17; 44-21; 44-22).

20. On August 24, 2020, Mr. Carrero emailed Mr. Russo stating, "we still have pending the date of my departure. As you can imagine the date, whichever it is, I need to plan for it. Any guidance would be greatly appreciated." (Docket No. 44-2 ¶ 27).

21. Mr. Carrero and Mr. Anderson then spoke on the phone, after which Mr. Anderson emailed Mr. Carrero: "We are fine with your request to have your last day with us be November 30. We appreciate your willingness to stay longer if unforeseen events should arise but, for now, we are all working toward November 30." Carrero responded: "Thank you, we'll see how the latest events go. It might be sooner." Id. ¶ 28.

22. On September 28, 2020, Mr. Carrero emailed Mr. Russo, "I am scheduled to terminate on November 30th. We will need someone to transition to. If like [sic], I have always expressed if needed I can continue upon mutual agreement." Id. ¶ 32.

23. Mr. Russo forwarded that email to Mr. Anderson and asked that he "secure [Mr. Carrero's] agreement" to an extension "as soon as we can, in case he's planning his next move." Id. ¶ 33.

24. As of September 28, 2020, it was understood that the "runout period" would last until August 2021. (Docket No. 53-2 ¶ 17).

25. On October 1, 2020, Mr. Anderson emailed Mr. Carrero to set up a time to speak about retaining his services full-time through the end of the year and part-time "through the end of February." (Docket No. 44-2 ¶ 34).

26. On October 12, 2020, Mr. Anderson wrote to Mr. Carrero stating:

> Thanks for your flexibility around some added
> time for your ongoing leadership of the plan.
>
> As discussed, we would like to retain you full
> time through the end of December. For January
> and February, we request that you are
> available to us on an as needed basis, not to
> exceed more that [sic] half-time, for January
> and February. I believe the simplest approach
> would be to just pay you your half-time salary
> for two months regardless of how much time we
> actually need. We do not plan to request
> further extensions beyond this and also
> understand that you will no longer be
> available after this date.
>
> Please let me know how this arrangement works
> for you. Thanks, Larry.

(Docket Nos. 44-2 ¶ 35; 44-13 ¶ 32; 44-28 at 3).

27. Plaintiff responded the same day with a list of requests. He also stated, "I do not see issues with the request" and "I appreciate the opportunity and have made arrangements to delay my departure[.]" (Docket Nos. 44-2 ¶ 35; 44-13 ¶ 32; 44-28 at 2).

28. On November 2, 2020, after further conversations with Mr. Anderson, Mr. Carrero returned an updated severance agreement (henceforth, the "Updated Waiver and Release Agreement") specifying that he would work full time at Molina PR "through December 31, 2020" and then part-time "through February 28, 2021[.]" (Docket Nos. 44-2 ¶ 36; 44-29 at 2).

29. Like the Original Waiver and Release Agreement, which it superseded, the Updated Waiver and Release Agreement included the following provisions:

    a) "[A]s of the Termination Date, [Mr. Carrero] is not entitled to any wages or compensation (including without limitation bonuses or incentive compensation), perquisites, other benefits, stock awards, stock options, stock appreciation rights, or other equity-based or cash-based awards from Company."

    b) A "General Release" that waived Plaintiff's claims against Molina, including any Worker Adjustment and Retraining Notification Act ("WARN Act") claims and those based on "any public policy violation or on any tort" such as fraud or misrepresentations.

    c) A "Waiver of Unknown Claims" that waived any unknown claims Plaintiff could have against Molina PR.

    d) An "Entire Agreement" section stating that "no promises or representations other than those set forth in this Agreement have been made to [Mr. Carrero] to induce [him] to sign this Agreement, . . . that [he] only has relied on promises expressly stated herein[,]" and that "[n]o amendments or modifications to this Agreement shall be binding unless made in a writing specifically referencing this Agreement and signed by [Mr. Carrero] and [Molina PR]."

(Docket Nos. 44-2 ¶ 37; 44-29 at 3-9; 44-30).

30. In October 2020, Mr. Carrero began sending text messages to Carmen Hernández, his subordinate in the Human Resources Department, requesting a WARN Act letter specifying that he was being laid off. (Docket No. 44-2 ¶ 38).

31. Plaintiff texted Mrs. Hernández on several occasions. One such text read: "Sorry, I didn't want this to be an email. When are they going to give me the WARN letter?" Id. ¶ 40.

32. Mrs. Hernández and another employee prepared WARN Act letters from a template to send Molina PR employees during the operation's runout period. (Docket Nos. 44-2 ¶ 41; 44-6 at 9; 44-7 ¶ 7).

33. Mrs. Hernández could not edit the WARN Act letter template Molina gave her. (Docket No. 44-2 ¶ 42).

34. Mrs. Hernández instructed her subordinate to insert Plaintiff's name on the form letter and the termination date that appeared in his Updated Waiver and Release Agreement. (Docket Nos. 44-2 ¶ 43; 44-7 ¶ 10).

35. WARN Act letters issued by Molina PR were ordinarily signed by Plaintiff himself, but Mrs. Hernández signed Mr. Carrero's WARN Act letter. (Docket Nos. 44-2 ¶ 44; 44-4 at 97; 44-6 at 5-6; 44-7 ¶ 11; 53-2 ¶ 36; 53-3).

36. The WARN Act letter was dated January 2, 2021, but it was sent to Plaintiff January 7, 2021. (Docket Nos. 53-2 ¶ 36; 53-3; 53-6 at 4).

37. Although Molina PR once had more than a hundred employees before the runout began, Mrs. Hernández only ever signed two WARN Act letters—the letter Plaintiff requested and a letter for his wife, who was also a Molina PR employee. (Docket No. 44-2 ¶ 45).

38. On January 5, 2021, Mrs. Hernández notified her supervisor, Amy O'Donnell, about the need to issue Mr. Carrero a WARN Act letter. (Docket Nos. 53-2 ¶ 35; 53-5 at 7; 53-7).

39. Mrs. Hernández did not send the WARN Act letter to Mr. Anderson, Mr. Russo, or any other Molina executive more senior than Mr. Carrero or who was negotiating with him. (Docket No. 44-2 ¶ 47).

40. Mr. Anderson, who was negotiating the terms of Plaintiff's separation from the company, did not approve and was not aware of the issuance of his WARN Act letter. Id. ¶ 46.

41. The WARN Act letter states in relevant part:

> Molina Healthcare of Puerto Rico Inc. (Plan Operations) is undergoing a reduction in its workforce that may be implemented in different stages. This notice, issued in compliance with the Worker Adjustment and Retraining Notification (WARN) Act, is to inform you that your position will be permanently eliminated. Accordingly, the effective end date of your employment with Molina will be March 1, 2021.

(Docket Nos. 53-2 ¶ 16; 53-3).

42. As preparations were being made for Plaintiff's departure, Mr. Anderson was made aware that although Mr. Carrero's last day was listed as February 28, 2021 in the Updated Waiver and Release Agreement as agreed, the termination date was listed as March 1, 2021. (Docket No. 44-2 ¶ 48).

43. On February 8, 2021, Mr. Anderson called Mr. Carrero to inform him of the issue regarding his termination date and ask that

he sign an amendment clarifying that his termination date would be February 28, 2021 in order to avoid the unintended consequence of his having received cash for his stock and then receiving the stock as well. Id. ¶ 51.

44. Mr. Carrero "totally agreed" and willingly signed the amendment. Id. ¶ 52.

45. Plaintiff never told Mr. Anderson that he had any issue with signing such an amendment, nor did he claim to be entitled to the shares that would have vested on March 1 on top of the cash payments. Id. ¶ 53.

46. On February 14, 2021, Mr. Carrero requested additional compensation for an issue regarding his retention bonus unrelated to the unvested stock, and Mr. Anderson agreed that $15,000 additional cash would be included in the amendment, bringing the total amount of cash paid as part of Mr. Carrero's severance agreement to $530,000. Id. ¶ 54.

47. On February 15, 2021, Mr. Carrero returned the signed amendment to the severance agreement (henceforth, the "Amendment"). Id. ¶ 55.

48. The Amendment stated that it was intended to "clarify the Termination Date[,]" now defined as "February 28, 2021." It also added $15,000 in compensation per Plaintiff's request related to his retention bonus. Id. ¶ 56.

49. The Amendment explicitly stated that it did not otherwise modify the severance agreement, the terms and conditions of which "remain in full force and effect." Id. ¶ 57.

50. In February 2021, Mr. Carrero told Mr. Anderson that he was available to work beyond February. Mr. Anderson told Mr. Carrero that he was not needed anymore. (Docket Nos. 44-2 ¶ 58; 44-4 at 52-58; 53-2 ¶¶ 9-10, 23; 53-4 at 5-6, 22-23).

51. No one at Molina told Plaintiff that a new Plan President, whether permanent or interim, would not be appointed. (Docket Nos. 44-2 ¶ 61 and 44-4 at 93-94).

52. Plaintiff testified that Molina had no obligation to tell him whether a new president would be appointed. He assumed no other president would be appointed based on the WARN Act letter and Mr. Anderson's statement that he was no longer needed. (Docket Nos. 44-2 ¶ 61; 44-4 at 93-94; 53-2 ¶¶ 3-4; 53-4 at 6, 9).

53. In early March 2021, Mr. Carrero received a text from Zivany Garcia regarding her new position as interim Health Plan President, thanking him for "helping her" and "guiding her[.]" Plaintiff, who was "disconnected from Molina at that point[,]" responded by "congratulating" Ms. Garcia. (Docket No. 44-2 ¶ 83).

54. Around the end of March 2021, Mr. Carrero saw a post on Ms. Garcia's Facebook page announcing her new title. Plaintiff

was "embarrassed, because it's actually on Facebook." He found it "highly embarrassing, having to find out through Facebook." (Docket Nos. 44-2 ¶ 84 and 53-2 ¶ 24).

55. Molina PR closed operations in summer 2022. (Docket No. 53-2 ¶ 43).

56. Ms. Garcia is no longer employed by Molina, and no one now holds the title of Health Plan President or interim Health Plan President for Molina PR. (Docket No. 44-2 ¶ 82).

### IV.   DISCUSSION

Summary judgment in favor of Defendant is appropriate in this case because Plaintiff has failed to proffer evidence establishing the first two elements of a *dolo* claim—a false representation and reasonable and foreseeable reliance thereon. *See* <u>Feliciano-Muñoz</u>, 970 F.3d at 64.

Mr. Carrero alleges that Molina PR made two false representations that induced him to sign the severance agreement: (1) the WARN Act letter issued in January and (2) Mr. Anderson's statement in February that Plaintiff would no longer be needed. (Docket No. 53 at 8-17; Fact ¶ 52). Mr. Carrero claims that the WARN Act letter and Mr. Anderson's statement indicated that Plaintiff's position would be permanently eliminated as of March 1, 2023. (Docket No. 53 at 2; Fact ¶ 52). He alleges that he would not have agreed to the severance package had he known that someone else would fill his role for the remainder of the runout period.

(Docket No. 53 at 8). However, neither the WARN Act letter nor Mr. Anderson's statement was a misrepresentation that Plaintiff reasonably and foreseeably relied upon.

Regardless of Plaintiff's assertion that the WARN Act letter contained a misrepresentation, his reliance thereon was unreasonable and unforeseeable. The WARN Act letter was a form letter that **Plaintiff *himself* requested from a subordinate *without* informing any of the Molina executives** with whom he was negotiating his severance package. (Facts ¶¶ 30–33, 39–40). It would have been unreasonable and unforeseeable for him to have interpreted it as a representation from Molina over the course of their negotiations that as part of their agreement, no one would be appointed to lead the remainder of the runout period.

What is more, Plaintiff was not laid off. In anticipation of the Puerto Rico office's closure, he reached a severance agreement with his former employer. The WARN Act requires that employers notify their employees 60 days before a plant closing or mass layoffs. 29 U.S.C. § 2102. Voluntary departures are excluded from the definition of an employment loss that triggers the Act's notification requirement. Id. § 2101(a)(6). Plaintiff had already signed a severance package as early as June 2, 2020. (Fact ¶ 19). Accordingly, Molina PR was under no obligation to send him a WARN Act letter. The Court also notes that Plaintiff's severance agreement waived any WARN Act claims. Id. ¶ 29.

The second alleged misrepresentation was Mr. Anderson's statement to Mr. Carrero that he would not be needed anymore. Plaintiff argues that Mr. Anderson told him that **a Health Plan President** was not needed anymore, not that Mr. Carrero himself was not needed anymore. (Docket No. 53-2 ¶ 9). He draws the Court's attention to a portion of his deposition in which he said, "And Larry clearly unequivocally stated that: 'No. No problem,' that I -- my services were no longer needed in Molina. That position was closed, was being eliminated." (Docket No. 53-4 at 5). However, later in the deposition, when Mr. Carrero was asked to clarify Mr. Anderson's exact words to him, the following exchange took place:

> Q. So Larry [Anderson] said, "Carlos, you are not needed."
> A. Yes.
> Q. Is that what he said?
> A. Yes. Absolutely.
> Q. Did he say the plan president position --
> A. No, not like that, no.
> Q. So what did he say exactly?
> A. Just like you said, and I will repeat it: ["]Don't worry, Carlos, we don't need you anymore."

(Docket No. 44-4 at 55). When asked to confirm that Mr. Anderson did not use the words "plan president position" or something similar, Mr. Carrero testified, "No. He just substituted it for 'you'; and 'you' in this case is plan president." <u>Id.</u> at 58. "[A] plaintiff cannot meet [the summary judgment] standard by pouncing on comments made by a deponent that the deponent himself has undercut with his later testimony." <u>Soto-Padro v. Pub. Bldgs.</u>

Auth., 675 F.3d 1, 7 (1st Cir. 2012) (citing Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 39 n.2 (1st Cir. 1999). **Per Plaintiff's own testimony**, Mr. Anderson never told him that **his position** would no longer be needed, simply that Mr. Carrero himself would no longer be needed. Accordingly, Mr. Anderson's statement is not a misrepresentation.

Another nail in the coffin of Plaintiff's *dolo* claim is that the alleged misrepresentations occurred in January and February 2021. This was **after** Plaintiff signed the Original Waiver and Release Agreement and the Updated Waiver and Release Agreement. (Facts ¶¶ 19, 28). **Thus, Plaintiff could not have relied on statements that had not yet been made in accepting the severance package.** To the degree Plaintiff is alleging that he relied on the WARN Act letter and Mr. Anderson's statement in signing the Amendment in February, all the evidence suggests that the Amendment was only meant to correct an error in the termination date in the Updated Waiver and Release Agreement. (Facts ¶¶ 25-28, 42-49). The language of the Amendment itself makes this clear, and **Plaintiff himself admits** this was its purpose.[2] (Facts ¶¶ 42-49; Docket Nos. 44-2 ¶¶ 48, 51-53, 56-57; 53-1 ¶¶ 48, 51-53, 56-57).

---

[2] The only other modification to the Updated Waiver and Release Agreement included in the Amendment was an additional $15,000 at Mr. Carrero's request for an unrelated matter. Fact ¶ 46.

Lastly, Plaintiff himself recognizes in his opposition to Defendant's Motion that "only those promises that appear in the agreement were relied upon for its execution." (Docket No. 53 at 6). The Original Waiver and Release Agreement and the Updated Waiver and Release Agreement contain provisions stating that "no promises or representations other than those set forth in this Agreement have been made to [Mr. Carrero] to induce [him] to sign this Agreement, . . . that [he] only has relied on promises expressly stated herein[,]" and that "[n]o amendments or modifications to this Agreement shall be binding unless made in a writing specifically referencing this Agreement and signed by [Mr. Carrero] and [Molina PR]." (Fact ¶ 29). The Amendment explicitly states that it does not otherwise modify the severance agreement, the terms and conditions of which "remain in full force and effect." (Fact ¶ 49). Thus, by signing the severance agreement, Mr. Carrero acknowledged that it was not contingent on any promise not expressly stated therein. *See* Feliciano-Muñoz, 970 F.3d at 66 ("While this may not be relevant to a breach of contract claim, given the SPA's integration clause, the summary judgment record shows that Feliciano was on notice that Rebarber intended the deal to be 'as is' and did not allow for a mechanical inspection of the airplanes. This further confirms that the dolo claim fails for want of reasonable reliance."); Westernbank Puerto Rico v. Kachkar, 2009 WL 6337949, at *24 (D.P.R. 2009) ("the defendants

cannot allege reasonable reliance on Westernbank's representations or omissions in light of the clear language of the no-reliance and integration clauses in the Personal Guarantees"). And no provision stated that the position of Health Plan President would remain vacant for the remainder of the runout period.

The Court's conclusion is bolstered by the fact that Mr. Carrero is a sophisticated party, (Fact ¶ 4), and "Puerto Rico courts place considerable weight on the education, social background, economic status, and business experience of the party seeking to avoid the contract" in determining whether to permit its invalidation based on *dolo*. <u>Feliciano-Muñoz</u>, 970 F.3d at 63 (quotation omitted).

The evidence establishes that Molina PR did not make a false representation to Mr. Carrero that induced him to sign the severance agreement, and that his reliance on the alleged misrepresentations would not have been reasonable or foreseeable. Given that Defendants successfully established the absence of a genuine dispute over the first two elements of a *dolo* claim, the Court need not address the remaining elements required to prevail.

### V.   CONCLUSION

For the foregoing reasons, Defendant's Motion at Docket No. 44 is **GRANTED**. Consequently, Plaintiff's claim of *dolo* is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of August 2023.

                                    S/ RAÚL M. ARIAS-MARXUACH
                                    United States District Judge