IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARLOS A. CARRERO,<br><br>**Plaintiff**<br><br>v.<br><br>MOLINA HEALTHCARE OF PUERTO RICO, INC.,<br><br>**Defendant** | CIVIL NO. 21-1605 (RAM) |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge

On August 11, 2023, this Court granted summary judgment in favor of Defendant Molina Healthcare of Puerto Rico, Inc. ("Molina PR") in relation to Plaintiff Carlos Carrero's claim that the company induced him through *dolo* to sign a severance agreement. (Docket No. 63). On August 14, 2023, the Court ordered Mr. Carrero to show cause as to why the Court should not grant summary judgment in favor of Molina PR on the company's breach of contract counterclaim against him. (Docket No. 64). The Court also instructed Molina PR to show cause as to why the Court should not dismiss Molina PR's unjust enrichment counterclaim given the existence of a contract in this case. Id. Pending before the Court are the parties' responses. (Docket Nos. 66 and 67). For the reasons stated below, the Court **GRANTS** summary judgment in favor of Molina PR on its breach of contract counterclaim and **DISMISSES**

its unjust enrichment counterclaim. Molina PR **SHALL** file a brief regarding the amount of damages to be awarded on or before September 29, 2023. The brief **SHALL** include the standard for calculating attorneys' fees where such fees are the actual damages incurred due to a breach of a covenant not to sue rather than incidental. Mr. Carrero **SHALL** respond on or before October 6, 2023.

## I. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is proper if (1) there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (citing Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A fact is considered material if it "has the potential of affecting the outcome of the case." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (citations and internal quotation marks omitted). Fed. R. Civ. P. 56 provides that after giving notice and a reasonable time to respond, courts may consider summary judgment on their own after identifying for the parties material facts that may not be genuinely in dispute. Fed. R. Civ. P. 56(f)(3).

B. **Breach of Contract**

Under Puerto Rico law, a breach of contract claim has three elements: (1) a valid contract, (2) a breach of that contract by one of the parties, and (3) damages consequent to that breach. Yacht Caribe Corp. v. Carver Yacht LLC, 270 F. Supp. 3d 547, 555 (D.P.R. 2017) (citations omitted). A valid contract requires consent, object, and cause. Soto v. State Indus. Prod., Inc., 642 F.3d 67, 72-73 (1st Cir. 2011) (citing P.R. Laws Ann. tit. 31, § 3391). "Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract." P.R. Laws Ann. tit. 31, § 3401. For an acceptance to operate as contractual consent, it must accept the tendered offer in its entirety without modifying it or adding new terms. BELFOR USA Grp., Inc. v. ESJ Resort LLC, 2018 WL 6623006, at *3 (D.P.R. 2018) (citation omitted). Courts presume the validity of a contract and the consent thereof. Citibank Glob. Mkts., Inc. v. Rodriguez Santana, 573 F.3d 17, 24 (1st Cir. 2009) (citation omitted).

When its terms are clear, leaving no doubt about the parties' intentions, a contract should be observed according to the literal sense of its stipulations. Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012) (citing P.R. Laws Ann. tit. 31, § 3471). "It is widely accepted that '[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations.'" Id.

Case 3:21-cv-01605-RAM   Document 75   Filed 09/22/23   Page 4 of 17

Civil No. 21-1605 (RAM)                                                    4

(citing P.R. Laws Ann. tit. 31, § 2994). A party that fails to comply with a contract's essential obligations is in breach of that contract. Id. (citations omitted).

## II. FINDINGS OF FACT

The following are the material facts that may not genuinely be in dispute, as identified in the Court's orders at Docket Nos. 63 and 64:[1]

1. Starting in 2019, discussions occurred within Molina concerning a possible sale of the assets of Molina PR or some other form of exit from the Puerto Rico healthcare market. (Docket No. 44-2 ¶ 12).

2. Sometime during summer 2020, Molina notified the Puerto Rico Administration of Health Insurance Services that it would cease providing services for the Vital program, Puerto Rico's publicly funded health insurance plan. This was Molina's only business venture in Puerto Rico. (Docket Nos. 53-2 ¶ 2; 1 ¶ 3.3; and 17 ¶ 3.3).

3. Mr. Carrero understood that a sale or other exit from Puerto Rico by Molina meant that, as its Plan President, "sooner or later" he would be "out." (Docket No. 44-2 ¶ 17).

4. On May 26, 2020, Larry Anderson (Molina's Global Head of Human Resources) emailed Mr. Carrero a severance agreement

---

[1] References to a specific finding of fact shall be cited in the following manner: (Fact ¶ _).

(henceforth, the "Original Waiver and Release Agreement"). Mr. Anderson's email also stated: "Please note, the only item missing at this point is to determine your last day. As things progress, you and Marc [Russo] will determine what makes sense." (Docket Nos. 44-2 ¶ 24; 44-13 ¶ 16; and 44-20 at 3).

5. Mr. Carrero signed the Original Waiver and Release Agreement on June 2, 2020 and returned it to Mr. Anderson on June 10, 2020. (Docket Nos. 44-2 ¶ 25; 44-13 ¶ 17; 44-21; and 44-22).

6. On August 24, 2020, Mr. Carrero emailed Marc Russo (Molina's Executive Vice President) stating, "we still have pending the date of my departure. As you can imagine the date, whichever it is, I need to plan for it. Any guidance would be greatly appreciated." (Docket No. 44-2 ¶ 27).

7. Mr. Carrero and Mr. Anderson then spoke on the phone, after which Mr. Anderson emailed Mr. Carrero: "We are fine with your request to have your last day with us be November 30. We appreciate your willingness to stay longer if unforeseen events should arise but, for now, we are all working toward November 30." Mr. Carrero responded: "Thank you, we'll see how the latest events go. It might be sooner." Id. ¶ 28.

8. On September 28, 2020, Mr. Carrero emailed Mr. Russo, "I am scheduled to terminate on November 30th. We will need someone to transition to. If like [sic], I have always expressed if needed I can continue upon mutual agreement." Id. ¶ 32.

9. Mr. Russo forwarded that email to Mr. Anderson and asked that he "secure [Mr. Carrero's] agreement" to an extension "as soon as we can, in case he's planning his next move." Id. ¶ 33.

10. As of September 28, 2020, it was understood that the "runout period" would last until August 2021. (Docket No. 53-2 ¶ 17).

11. On October 1, 2020, Mr. Anderson emailed Mr. Carrero to set up a time to speak about retaining his services full-time through the end of the year and part-time "through the end of February." (Docket No. 44-2 ¶ 34).

12. On October 12, 2020, Mr. Anderson wrote to Mr. Carrero stating:

> Thanks for your flexibility around some added time for your ongoing leadership of the plan.
>
> As discussed, we would like to retain you full time through the end of December. For January and February, we request that you are available to us on an as needed basis, not to exceed more that [sic] half-time, for January and February. I believe the simplest approach would be to just pay you your half-time salary for two months regardless of how much time we actually need. We do not plan to request further extensions beyond this and also understand that you will no longer be available after this date.
>
> Please let me know how this arrangement works for you. Thanks, Larry.

(Docket No. 44-28 at 3).

13. Plaintiff responded the same day with a list of requests. He also stated, "I do not see issues with the request" and "I appreciate the opportunity and have made arrangements to delay my departure[.]" (Docket Nos. 44-2 ¶ 35; 44-13 ¶ 32; and 44-28 at 2).

14. On November 2, 2020, after further conversations with Mr. Anderson, Mr. Carrero returned an updated severance agreement (henceforth, the "Updated Waiver and Release Agreement") specifying that he would work full time at Molina PR "through December 31, 2020" and then part-time "through February 28, 2021[.]" (Docket Nos. 44-2 ¶ 36 and 44-29 at 2).

15. The Updated Waiver and Release Agreement contains the following relevant provisions:

    > WHEREAS, Executive and Company desire to resolve all outstanding matters with respect to Executive's employment with and separation from Company; and
    >
    > WHEREAS, Executive and Company desire to fully release all claims which Executive in any capacity may have or claim to have, including without limitation claims arising out of or in any way relating to Executive's employment with and separation of employment from Company.
    >
    > . . .
    >
    > 4. **General Release**. Executive, for himself and for his heirs, executors, administrators, successors, and assigns, does hereby irrevocably and unconditionally waive, release and forever discharge, Company, its past and present parents, subsidiaries,

affiliates, divisions, predecessors, successors, and assigns, and its and their respective current and former employees, officers, directors and agents (collectively, the "Released Parties"), **from any and all** past or present claims, demands, causes of action, lawsuits, grievances, obligations, damages, expenses, attorneys' fees, and liabilities **of whatever kind or nature**, known or unknown (all hereinafter referred to as "Claims"), which he ever had, now has, or may hereafter claim to have had, against the Released Parties or any of them based on any events, facts or circumstances arising at any time on or before the date of this Agreement, **including but not limited to claims that relate to Executive's service with Company and/or the separation from such service**. Executive agrees that this general release of Claims **includes, but is not limited to**, (a) claims of race, age, gender, sexual orientation, religious or national origin discrimination or any other legally protected status under Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended ("ADEA"); and under any other federal, state or local laws, as amended; (b) claims based on any other federal, state or local laws, including but not limited to the Equal Pay Act; the Americans with Disabilities Act; the Americans with Disabilities Act Amendments Act; the Labor Management Relations Act; the Employee Retirement Income Security Act ("ERISA"); the Sarbanes-Oxley Act of 2002; the Worker Adjustment and Retraining Notification Act ("WARN"); as well as any amendments to those laws; **(c) claims of disputed wages or entitlement to any other pay**; (d) claims of wrongful discharge under local Law 80 of 1976, or retaliation; (e) claims of breach of any implied or express contract or covenant (including but not limited to any claims arising under the Offer Letter or under Company's Equity Incentive Plan, Long-Term Incentive Plan or Phantom Stock Plan); (t) claims for violation of personnel policies,

handbooks, or any covenant of good faith and fair dealing; (g) claims for promissory estoppel; (h) ERISA claims; (i) claims for wrongful denial of insurance or other benefits; and (j) claims based on any public policy violation or on any tort, such as invasion of privacy, sexual harassment, defamation, **fraud, misrepresentation** and/or infliction of emotional distress. Execution of this Agreement by Executive operates as a complete bar and defense against any and all Claims that may be made by Executive against the Released Parties or any of them. Executive expressly understands that among the various claims and rights being waived by Executive in this Agreement are those arising under the ADEA, and in that regard Executive specifically acknowledges that Executive has read and understands the provisions of Section 9 below before signing this Agreement.

5. **Exclusions from General Release; Protected Rights**. Notwithstanding anything to the contrary in Section 4 above, Executive is not prohibited from making or asserting: (a) Executive's rights under this Agreement and any claims arising from the breach of this Agreement by Company, including any claim for breach of Company's obligation to make the payments described in Sections 2 and 3 above; (b) any claims for unemployment compensation, workers' compensation or state disability insurance benefits pursuant to the terms of applicable state laws; and (c) Executive's rights, if any, to indemnity pursuant to law, Company's articles, bylaws, or any indemnification agreement between Company and Executive; and/or to the protections of any director' and officers' liability policies of Company.

    . . .

7. **Waiver of Unknown Claims**. It is Executive's intention (and Executive agrees) that Executive's **execution of this Agreement will forever bar every claim, demand or cause of**

**action it releases**. Executive agrees that this Agreement shall constitute a complete defense to any such claim, demand or cause of action. Executive recognizes that Executive may have some claim, demand or cause of action against Company or any other Released Party which are part of the Claims that this Agreement releases of which Executive is unaware and unsuspecting which Executive is giving up by execution of this Agreement, but it is Executive's intention (and Executive agrees) that in executing this Agreement he shall be deprived of such claim, demand or cause of action and shall be prevented from asserting it against Company or any other Released Party.

. . .

19. **No Current/Future Actions Filed; Covenant Not To Sue**. Executive represents and warrants that no type of administrative or legal action arising out of claims waived and/or released by this Agreement has been filed to date and that he **will not sue or become party to any litigation arising out of claims waived or released by this Agreement.** If Executive hereafter commences or becomes party to any action or proceeding against any Released Party based upon any of the claims waived and/or released by this Agreement, the Released Parties will be entitled to apply for an injunction to restrain such violation. This Agreement may be pleaded by the Released Parties as a defense, counterclaim or cross-claim in any such action or proceeding.

20. **Entire Agreement**. Executive acknowledges that **no promises or representations other than those set forth in this Agreement have been made to Executive** to induce Executive to sign this Agreement, and that Executive **only has relied on promises expressly stated herein**. The Parties agree that nothing in this Agreement shall affect the provisions of this Offer Letter that survive the termination of the Executive's employment with the Company.

> No amendments or modifications to this Agreement shall be binding unless made in a writing specifically referencing this Agreement and signed by Executive and Company.
>
> . . .
>
> 22. **Breach**. In the event of any breach of this Agreement by Executive, Executive shall indemnify the Released Parties from and against all liabilities, costs and expenses, including attorneys' fees, arising out of said breach.

(Docket Nos. 44-29 and 44-30) (emphasis added).

16. As preparations were being made for Plaintiff's departure, Mr. Anderson was made aware that although Mr. Carrero's last day was listed as February 28, 2021 in the Updated Waiver and Release Agreement as agreed, the Termination Date was listed as March 1, 2021. (Docket No. 44-2 ¶ 48).

17. On February 8, 2021, Mr. Anderson called Mr. Carrero to inform him of the issue regarding his Termination Date and ask that he sign an amendment clarifying that his Termination Date would be February 28, 2021 in order to avoid the unintended consequence of his having received cash for his stock and then receiving the stock as well. Id. ¶ 51.

18. Mr. Carrero "totally agreed" and willingly signed the amendment. Id. ¶ 52.

19. Plaintiff never told Mr. Anderson that he had any issue with signing such an amendment, nor did he claim to be entitled to

   the shares that would have vested on March 1 on top of the cash payments. Id. ¶ 53.

20. On February 14, 2021, Mr. Carrero requested additional compensation for an issue regarding his retention bonus unrelated to the unvested stock, and Mr. Anderson agreed that $15,000 additional cash would be included in the amendment, bringing the total amount of cash paid as part of Mr. Carrero's severance agreement to $530,000. Id. ¶ 54.

21. On February 15, 2021, Mr. Carrero returned the signed amendment to the severance agreement (henceforth, the "Amendment"). Id. ¶ 55.

22. The Amendment states that it was intended to "clarify the Termination Date[,]" now defined as "February 28, 2021." It also added $15,000 in compensation per Plaintiff's request related to his retention bonus. Id. ¶ 56.

23. The Amendment also contains the following provision:

   > 4. **No Other Modification**. Except as provided in this Amendment, the terms and conditions of the Agreement will remain in full force and effect. Any inconsistencies or differences between this Amendment and the Agreement will be interpreted and construed in favor of this Amendment.

   (Docket No. 44-34).

24. The Amendment does not modify any of the above-cited provisions in the Updated Waiver and Release Agreement at Fact ¶ 15. (Docket No. 44-34).

25. No one at Molina told Plaintiff that a new Plan President, whether permanent or interim, would not be appointed. (Docket Nos. 44-2 ¶ 61 and 44-4 at 93-94).

26. Plaintiff testified that Molina had no obligation to tell him whether a new president would be appointed. He assumed no other president would be appointed based on the WARN Act letter and Mr. Anderson's statement that he was no longer needed. (Docket Nos. 44-2 ¶ 61; 44-4 at 93-94; 53-2 ¶¶ 3-4; and 53-4 at 6, 9).

27. Molina PR closed operations in summer 2022. (Docket No. 53-2 ¶ 43).

28. Notwithstanding paragraph 19 of the Updated Waiver and Release Agreement, Mr. Carrero commenced the present lawsuit against Molina PR on December 14, 2021. (Docket No. 1).

### III. DISCUSSION

There is no genuine dispute as to any of the elements of Molina PR's breach of contract counterclaim against Mr. Carrero. The record is clear that 1) the parties had a valid contract; 2) Mr. Carrero breached that contract's covenant not to sue; and 3) this breach caused Molina PR damages in the form of costs and attorneys' fees for defending against this litigation. The Court takes each of these elements in turn.

The Updated Waiver and Release Agreement as amended is a valid contract. The cause was Molina's exit from the Puerto Rico

healthcare market and Mr. Carrero's consequent separation from the company. (Facts ¶¶ 1-3). The cause of the Amendment was to correct a typographical error in the Updated Waiver and Release Agreement and provide Mr. Carrero with additional compensation for an issue regarding his retention bonus. (Facts ¶¶ 16-22). The object of the Updated Waiver and Release Agreement and its Amendment was the terms of Mr. Carrero's departure from Molina PR. (Facts ¶¶ 15 and 23; Docket Nos. 44-29; 44-30; and 44-34). Finally, Plaintiff signed and consented to the Updated Waiver and Release Agreement and the Amendment as written without further modification. (Facts ¶¶ 14 and 21; Docket Nos. 44-29; 44-30; and 44-34).

Undeniably, Plaintiff breached the covenant not to sue in the Updated Waiver and Release Agreement by initiating the present lawsuit. (Facts ¶¶ 15 and 28). Mr. Carrero attempts to argue that the contract only releases Molina PR from employment law claims, but a simple review of the relevant contract provisions easily contradicts him. (Fact ¶ 15). The Updated Waiver and Release Agreement releases Molina PR "from any and all" claims of "whatever kind or nature[.]" Id. This "includes, **but is not limited to**," employment law claims. Id. (emphasis added). Finally, given Molina PR's need to incur costs and attorneys' fees in defending against this lawsuit, there were clearly damages as a result of Mr. Carrero's breach. (Fact ¶ 28).

Mr. Carrero raises two additional defenses in his response to the Court's show cause order. <u>First</u>, he claims that the contract is nullified because Molina PR illegally obtained his consent. (Docket No. 67). The Court has already determined that there was no *dolo* in the contract's formation. (Docket No. 63). Molina PR never represented to Mr. Carrero that no one would serve as interim president after his departure. <u>Id.</u> Nor would his reliance on any such statement have been reasonable in light of the Updated Waiver and Release Agreement's integration clause. <u>Id.</u>

<u>Second</u>, Mr. Carrero argues that *dolo* claims cannot be waived. (Docket No. 67). None of Mr. Carrero's cited cases support this theory. Nor is his attempt to compare waiver of *dolo* claims to waiver of duress claims persuasive. Waiving claims for *dolo* in the formation of a contract after having ample time to consider the contract's terms, especially when said contract has an integration clause stating that Plaintiff has only relied upon the promises therein, is not akin to being forced to sign a waiver of duress claims at gunpoint. *See* <u>Feliciano-Muñoz</u>, 970 F.3d at 66 ("While this may not be relevant to a breach of contract claim, given the SPA's integration clause, the summary judgment record shows that Feliciano was on notice that Rebarber intended the deal to be 'as is' and did not allow for a mechanical inspection of the airplanes. This further confirms that the dolo claim fails for want of reasonable reliance."); <u>Westernbank Puerto Rico v. Kachkar</u>, 2009

WL 6337949, at *24 (D.P.R. 2009) ("the defendants cannot allege reasonable reliance on Westernbank's representations or omissions in light of the clear language of the no-reliance and integration clauses in the Personal Guarantees").

### IV. CONCLUSION

The Court thus finds that Mr. Carrero breached the Updated Waiver and Release Agreement as amended. Defendant is **ORDERED** to brief the amount of damages to be awarded on or before September 29, 2023.[2] The brief **SHALL** include the standard for calculating attorneys' fees where such fees are the actual damages incurred due to a breach of a covenant not to sue rather than incidental. Mr. Carrero **SHALL** respond on or before October 6, 2023.

The Court dismisses Molina PR's unjust enrichment counterclaim given the existence of a contract in this case and Defendant's concession that it was pled in the alternative. *See* Puerto Rico Tel. Co. v. SprintCom, Inc., 662 F.3d 74, 97 (1st Cir. 2011) ("under Puerto Rico law, the doctrine of unjust enrichment does not apply where . . . there is a contract that governs the dispute at issue"); (Docket No. 66).

---

[2] Judges may determine the amount of attorneys' fees awarded as damages in cases where such fees are the actual damages from a breach of a covenant not to sue rather than incidental. *See* McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1313-14 (2d Cir. 1993); Resolution Trust Corp. v. Marshall, 939 F.2d 274, 279-80 (5th Cir. 1991); Eastern Trading Co. v. Refco, Inc., 229 F.3d 617, 627 (7th Cir. 2000).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of September 2023.

S/ RAÚL M. ARIAS-MARXUACH<br>United States District Judge